**T & T DRAPERY SERVICE, INC., Appellant,**

v.

**Gary Paul BROWN et al., Appellees.**

**No. 18846.**

Court of Civil Appeals of Texas, Dallas.

Feb. 12, 1976.

Robert L. Russell Bush, Rohne & Hooden-pyle, Arlington, for appellant.

Glennis E. Sims, Bailey, Williams, West-fall, Lee & Fowler, Dallas, for appellees.

GUITTARD, Justice.

This injunction suit was brought by T & T Drapery Service, Inc. to restrain two of its former employees, Gary Brown and Lacey Moore, from competing with plaintiff in violation of covenants in their employment contracts.

The trial court denied a temporary injunction, and plaintiff appeals. We hold that this order was within the court's discretion because there is evidence to support a finding that plaintiff failed to show probable injury to plaintiff's business pending final trial.

Plaintiff contends in its first point that the trial court abused its discretion in denying the temporary injunction because the evidence "tended to show that Plaintiff had suffered a probable injury in losing the drapery business of the apartment complexes known as Whispering Hills and Lazy Acres as a result of Defendants Brown and Moore's breach of their employment contracts with Plaintiff." Disposition of this contention requires a review of the evidence.

Plaintiff is in the business of cleaning, repairing and selling commercial draperies. Most of its customers are apartment complexes in and around the Dallas area. It has divided its trade area into a number of routes, each of which is handled by a route salesman. The salesman has the responsibility to deal with customers, take down the draperies, bring them into the plant to be cleaned and pressed, return them, rehang them, and make any rod repairs necessary to hang them properly. Since plaintiff's business is based on service to its customers, and that service is performed by the route salesmen, the good will of plaintiff's business consists principally of the rapport established between the salesmen and the customers. In the past plaintiff had experienced a loss of business as a result of loss of several of its salesmen to competitors. To protect its business against further losses of this kind, plaintiff requires its salesmen to sign employment contracts in which they agree not to engage in the drapery service business in competition with plaintiff within a one-hundred-mile radius of Dallas, Texas, for a period of three years after leaving plaintiff's employment.

Defendants Brown and Moore had been employed as route salesmen for plaintiff several months before signing these contracts. Neither had any knowledge of the business before they began working for plaintiff, and both had received all of their training from plaintiff. After working under the written contracts for more than seven months, defendants quit and went to work for a competing company known as The Workroom, Incorporated, doing substantially the same type of work as they did for plaintiff. At the time of the temporary-injunction hearing, defendant Moore was serving several of the customers he had formerly served for plaintiff, but none of these former customers were customers of plaintiff at the time Moore left. Defendant Brown's route for The Workroom was in a different area from the routes he had worked for plaintiff, but he was familiar with some of plaintiff's customers in that area because he had occasionally assisted plaintiff's other route salesmen there.

Defendant Moore testified that at the time of the hearing he was not serving any of the customers for The Workroom that he

had served when he was working for plaintiff. He acknowledged that he had served the Lazy Acres complex for plaintiff and had developed a good rapport with the manager. He admitted that this manager had shifted her drapery business to The Workroom after he had gone to work for that company, and said that he did not know whether his employment by The Workroom was the reason for her switching over, but thought it was "a big factor." He testified, however, that the management of Lazy Acres had been taken over by First Property Management Company, which already had an agreement with The Workroom concerning their drapery service.

Whispering Hills was another customer Moore had served when working for plaintiff, but was not on Moore's route at the time he left. Whispering Hills switched to The Workroom after Moore went to work there, and Moore first testified that the reason for the shift was his good rapport with the manager and that the manager found out that he was with The Workroom and wanted him to be her route driver. He also testified, however, .that his rapport with this manager "wasn't necessarily the reason why she came with The Workroom" because she switched over knowing that he would not be her route driver.

Both Moore and Brown testified that their duties as route drivers for The Workroom were confined to the service of The Workroom's established customers and did not include solicitation of new customers. . Moore admitted that he had given the name of his former customers to another employee, who went out and talked to them, but he denied that any of these customers had shifted over to The Workroom because of his acquaintance with the managers. Rather, he said that they shifted because they were managed by First Property Management Company, and all of the First Property apartments were customers of The Workroom.

Moore also admitted that he had gone to Timberpark I at the request of the manager to talk about doing business with her. She was a customer of plaintiff, but Moore "gathered" that she no longer had credit with plaintiff. There is no evidence that plaintiff ever lost the patronage of Timberpark I.

Plaintiff's president, Claude Thomas, testified that he had lost customers since Moore and Brown left, but the only customers he could name were Lazy Acres and Whispering Hills. He knew, however, that Whispering Hills had recently been sold and was being managed by a California company and that the company operating Lazy Acres had also had a change of management.

Plaintiff was unable to establish any direct economic loss as a result of competition by Brown and Moore. Thomas testified that plaintiff's business had decreased during the year preceding defendants' departure as a result of the general business slump as well as the earlier loss of several route salesmen. He was unable to say whether plaintiff's gross sales had decreased since Moore and Brown had left. One of his supervisors, Murray Edwards, testified that since that time the business of all his routes had fallen off. He did not mention any greater decline on the routes defendants had worked for plaintiff. Defendant Brown testified that The Workroom's prices were considerably lower than plaintiff's and that plaintiff had been losing customers to The Workroom before he and Moore left.

Although this evidence might have justified the trial court in issuing a temporary injunction restraining defendants from competing with plaintiff pending final trial, we cannot say that the court abused its discretion in denying it. To authorize issuance of the writ, the plaintiff must present evidence tending to show not only a probable right of recovery on final hearing, but also a probable injury in the interim. *Millwrights Local Union v. Rust Engineering Co.*, 433 S.W.2d 683, 686 (Tex. 1968). Here plaintiff could identify only

two of its customers as having been lost to The Workroom after defendants began working there, and plaintiff's assertion of probable injury pending the suit appears to be based primarily on the loss of these two customers. There is evidence tending to show that the loss of these customers was the result of factors other than competition by defendants, such as management changes and The Workroom's lower prices. Viewing the evidence here most favorably to defendants, as we must if necessary to uphold the trial court's order, we hold that it justifies the trial court's finding that no probable injury as a result of defendant's competition was shown.

We need not decide the question of validity of the covenants against competition in the employment contracts, nor need we review the trial court's findings concerning the time and distance limits in those covenants.

Affirmed.